**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| Mona Samuel Sampson and Orlando Samuel, Personal Representatives of the Estate of Harry Samuel<br>James T. Vaughn Correctional Center<br>1181 Paddock Road,<br>Smyrna, Delaware 19977<br><br>Christopher Robert Desmond<br>James T. Vaughn Correctional Center<br>1181 Paddock Road,<br>Smyrna, Delaware 19977<br><br>Arthur Govan<br>James T. Vaughn Correctional Center<br>1181 Paddock Road,<br>Smyrna, Delaware 19977<br><br><br>Individually and on behalf of others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br><br><br><br>Centene Corporation<br>7700 Forsyth Boulevard<br>St. Louis, Missouri 63105<br><br>Centurion of Delaware LLC<br>1593 Spring Hill Road, Suite 600<br>Vienna, Virginia 22182<br><br>VitalCore Health Strategies<br>719 SW Van Buren Street, Suite 100<br>Topeka, Kansas 66603 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No.
**JURY TRIAL DEMANDED**
**CLASS ACTION**

2

Medical Director Dr. Awele Maduka-Ezeh )
Department of Corrections )
245 McKee Road )
Dover, Delaware 19904 )
                                        )
                     Defendants.        )
                                        )
_____ )

## SECOND AMENDED CLASS ACTION COMPLAINT

1.      Prisoners held in government custody have a basic right to health care and humane conditions of confinement protected by the Eighth and Fourteenth Amendments prohibiting cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (holding government has "obligation to provide medical care for those whom it is punishing by incarceration"). "Systemic logistical constraints such as understaffing, which are unrelated to medical judgment, will typically not excuse failure to provide adequate medical care." *Parkell v. Danberg*, 833 F.3d 313, 339 (3d Cir. 2016); *see also, Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979) (The Eighth Amendment is violated "where the size of the medical staff at a prison in relation to the number of inmates having serious health problems constitutes an effective denial of access to diagnosis and treatment").

2.      This lawsuit seeks redress for Defendants' deliberate indifference in "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05.  Defendants are individually and collectively responsible for ensuring that the correctional health system provides adequate medical care to those incarcerated by the State of Delaware.  Yet instead of providing this care, Defendants acted with callous and deliberate indifference to the health of incarcerated men and women, including by adopting customs and policies that delayed and denied needed medical care for serious medical conditions.  They significantly understaffed the correctional health care system and intentionally delayed and denied needed medical care.  They

3

utterly failed to supervise medical staff and failed to terminate incompetent staff known to have been engaged in past violations. Instead, they allowed Plaintiffs and the Plaintiff Class to suffer.

3. On behalf of themselves and persons similarly situated, plaintiffs allege that from April 1, 2020, up to and including the present, Defendants repeatedly denied and delayed treatment for serious medical conditions. Defendants refused to provide necessary specialist care and refused to provide prescribed medications, medical tests such as imaging, and surgeries.

4. Defendants' egregious misconduct has not been occasional but instead is systemic and ongoing. Plaintiffs seek all available remedies, including but not limited to, an injunction and damages.

## JURISDICTION

5. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs seek declaratory, injunctive relief, and damages under 28 U.S.C. §§1343, 2201 and 2202 and 42 U.S.C. § 1983, for violations of their constitutional rights.

6. This Court has supplemental jurisdiction over Plaintiffs' state law negligence claims.

## VENUE

7. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) because Plaintiffs' claims for relief arose in this District.

## PARTIES - PLAINTIFFS

8. Plaintiffs Mona Samuel Sampson and Orlando Samuel serve as personal representatives of the Estate of Harry Samuel. Harry Samuel was incarcerated from June 1993 until his death on April 21, 2024.. He served his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977. Plaintiff Samuel had a serious medical

condition and died from that condition.. Yet Defendants failed to provide him with needed emergency care and refused to take him to a specialist despite their own staff admitting such care was medically necessary.

9.      Harry Samuel suffered directly from Defendants' negligence and deliberate indifference to his serious medical needs.  He was deprived of constitutionally adequate medical care.  His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

10.      Plaintiffs Monda Samuel Sampson and Orlando Sameul are acting as personal representatives, have a high school education and the ability to read and understand legal proceedings.  They are  willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

11.      Plaintiff Christopher Robert Desmond has been incarcerated since November 1991. He presently serves his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977.  Plaintiff Desmond suffers from significant chronic medical conditions and was placed in Defendants' Chronic Care Program.  Yet despite knowing that Plaintiff Desmond suffered from these conditions, Defendants knowingly and intentionally refused to provide Plaintiff Desmond his prescribed medications for 47 days, improperly using the denial of medication as a form of discipline.  Defendants also failed to bring Plaintiff Desmond to see the cardiologist, as is required for the treatment of his heart disease.

12.      Plaintiff Desmond suffered directly from Defendants' negligence and deliberate indifference to his serious medical needs.  He was deprived of constitutionally adequate medical care.  His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

5

13. Plaintiff Desmond has a high school education and the ability to read and understand legal proceedings. He is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

14. Plaintiff Arthur Govan has been incarcerated since October 1992. He presently serves his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977. Plaintiff Govan has a serious medical condition. Yet Defendants failed to provide him with needed emergency care and refused to take him to a specialist despite their own staff admitting it was medically necessary.

15. Plaintiff Govan suffered directly from Defendants' negligence and deliberate indifference to his serious medical needs. He was deprived of constitutionally adequate medical care. His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

16. Plaintiff Govan has a high school education and the ability to read and understand legal documents. He is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

17. Plaintiff Nathaniel Bagwell has been incarcerated for forty-one years. He presently serves his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977.

18. Plaintiff Bagwell has a demonstrated ability to read and understand legal proceedings. His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

19.     Plaintiff Bagwell is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

20.     Plaintiff Jamie Baker has been incarcerated for eleven years.  She presently serves her sentence at Baylor Women's Correctional Institution, 660 Baylor Blvd., New Castle, Delaware 19720.  Plaintiff Baker suffers from cauda equina syndrome, Gier Bar syndrome and bipolar disorder.

21.     Plaintiff Baker's claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

22.     Plaintiff Baker has a high school diploma, has enrolled in courses to achieve her associate's degree, and has demonstrated ability to read and understand legal proceedings.  She is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

23.     Plaintiff Gerald Bulat has been incarcerated for twelve years.  He presently serves his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977.

24.     Plaintiff Bulat suffered directly from Defendants' negligence and deliberate indifference to his serious medical needs.  He was deprived of constitutionally adequate medical care.  His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

25.     Plaintiff Bulat has a demonstrated ability to read and understand legal proceedings.  He is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

7

26.     Plaintiff Ronald B. Jackson has been incarcerated for nine years.  He presently serves his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977.  Plaintiff Jackson suffers from type II diabetes, gum disease, anxiety and sleep disorders.

27.     Plaintiff Jackson suffered directly from Defendants' negligence and deliberate indifference to his serious medical needs.  He was deprived of constitutionally adequate medical care.  His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

28.     Plaintiff Jackson has a high school diploma and has demonstrated ability to read and understand legal proceedings.  He is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

29.     Plaintiff Michael Taylor has been incarcerated for thirty-six years.  He presently serves his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977.  Plaintiff Taylor suffers from HIV (which was his only medical condition upon incarceration), hypothyroidism, anemia, high blood pressure, spinal stenosis, six herniated discs in his back and five herniated discs in his spine, pinched nerves, osteoarthritis, a double inguinal hernia, MGUS, pulmonary fibrosis, and type 2 diabetes.  He also had kidney stones.

30.     Plaintiff Taylor suffered directly from Defendants' negligence and deliberate indifference to his serious medical needs.  He was deprived of constitutionally adequate medical care.  His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

31.    Plaintiff Taylor has a demonstrated ability to read and understand legal proceedings.  He is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

## PARTIES - GOVERNMENTAL DEFENDANT

32.    Defendant Medical Director Dr. Awele Maduka-Ezeh has offices at 245 McKee Road, Dover, Delaware 19904.  She has served as the Medical Director since July 2018.  In her role as Medical Director, she has a personal and professional non-delegable responsibility to ensure that those incarcerated by Delaware receive adequate health care in a timely fashion.

## PARTIES - CORPORATE DEFENDANTS

33.    Defendant Centene Corporation, a publicly-traded Delaware corporation with principal executive offices located at 7700 Forsyth Boulevard, St. Louis, Missouri, formed, owned and controlled Defendant Centurion of Delaware LLC, which contracted with the DOC Commissioner to provide healthcare from April 1, 2020 until June 30, 2023.

34.    On January 10, 2023, Defendant Centene sold Defendant Centurion to an undisclosed buyer, who continued to operate with a headquarters at 1593 Spring Hill Road, Suite 600, Vienna, Virginia 22182 and 21251 Ridgetop Circle, Sterling VA 20166.  As a result of the sale, Defendants are referred to as Defendant Centene/Centurion for the period prior to January 10, 2023, and Defendant Centurion for the period January 10 to June 30, 2023.

35.    Defendant VitalCore Health Strategies ("Defendant VitalCore") is the current health care provider for all Delaware correctional facilities.  Defendant VitalCore is located at 719 S.W. Van Buren Street, Suite 100, Topeka, Kansas 66603.  Defendant VitalCore assumed responsibility for the correctional health care system on July 1, 2023, although it had full and unfettered access to the system prior to that date.

9

## FACTUAL ALLEGATIONS

### PLAINTIFFS AND PLAINTIFF CLASS SUFFER FROM DEFENDANTS' SYSTEMIC VIOLATIONS OF THE EIGHTH AND FOURTEEN AMENDMENT AND NEGLIGENCE

36.     The named Plaintiffs and the proposed plaintiff class have all been damaged by Defendants' deliberate indifference to their serious medical needs.

37.     **Plaintiff Samuel** died due to Defendants' wrongful delays and denials of needed medical care.  Defendants' delays and denials resulted in Plaintiff Samuel's treatable condition progressing to Stage IV terminal cancer and death.

38.      On or about November 29, 2022, Plaintiff Samuel began to bleed from his rectum and penis.  He immediately sought emergency care from Defendant Centene/Centurion staff but did not receive any evaluation or care.

39.     On or about November 30, 2022, Defendant Centene/Centurion staff member Rich finally saw Plaintiff Samuel's but failed to provide any treatment.

40.     Defendant Centene/Centurion's lack of any treatment caused Plaintiff Samuel's condition to worsen.  Plaintiff Samuel repeatedly submitted "sick calls" and grievances to no avail.

41.     On or about January 1, 2023, Plaintiff Samuel submitted another sick call because the bleeding was getting worse.

42.     Three days later, on or about January 4, 2023, Plaintiff Samuel saw Centene/Centurion staff member Amillya.  She put Plaintiff Samuel on the list to see a Centene/Centurion physician assistant.  Plaintiff Samuel continued to bleed profusely.

43.     On or about January 6, 2023, six days after Plaintiff Samuel had submitted the "sick call," Centene/Centurion acting through Jordan McNairn, PA-C, (hereinafter referred to as

10

PA McNairn) saw Plaintiff Samuel and told him that he may have diverticulosis and prescribed over-the-counter fiber tablets and stool softener Colace.  She did not prescribe any antibiotics.

44.    By February 7, 2023, at approximately 5pm, Plaintiff Samuel was extensively bleeding from his rectum.  He collected the clot of blood and asked to be taken to the infirmary on an emergency basis.

45.    Sgt. M. Pock and Lawrence Collingwood Jr., an inmate, transported Plaintiff Samuel to the infirmary in a wheelchair.  When they arrived at the infirmary, a staff member took his blood pressure.  Plaintiff Samuel's extensive blood loss caused him to become faint and he slipped from the wheelchair onto the floor.

46.    Nobody reacted.  Correctional staff and Centene/Centurion medical staff simply allowed Plaintiff Samuel to lay on the floor, bleeding profusely, for ten minutes.  Eventually, Plaintiff  Samuel was placed in an ambulance and transported to BayHealth Emergency Department.  The examining physician advised that he needed to see a specialist and have surgery.

47.    Despite the emergency nature and Plaintiff Samuel's continued bleeding, Defendant Centene/Centurion failed to provide him with the needed specialist consultation and surgery.

48.    He continued to bleed profusely and experience pain.  Nothing was done.

49.    After July 1, 2023, after Defendant VitalCore assumed control of the health care system, Plaintiff Samuel received a bone scan and a colonoscopy that revealed the meritless delays had resulted in terminal prostate and rectal cancer.

50.    Defendant VitalCore advised Mr. Samuel that he was not going to be provided any treatment.  Mr. Samuel died on April 21, 2024.

51.     **Plaintiff Govan** does not know whether or not he has prostate cancer – and if he does, what stage it has reached – because Defendants continue to delay and deny him his needed consult with a specialist.

52.     On or about September 15, 2022, Plaintiff Arthur Govan began to experience prostrate problems.  Plaintiff Govan complained of urinary hesitation to Defendant Centene staff. His blood work showed that his prostate specific AG was 14.1.

53.     On September 26, 2022, Defendant Centene, acting through PA McNairn, signed a referral for specialist healthcare to have Plaintiff Govan seen by a urologist.  The referral stated under the heading "significant treatment/interventions" that Plaintiff Govan had "elevated PSA – poor control, stable.  Family hx [history] of prostate cancer.  PSA elevated – started on Flomax at last visit and has had some relief.  Repeat PSA – free and total ordered for 10/2022.  Will place urology consult."  This referral was e-signed by certified PA McNairn.

54.     Yet Defendant Centene/Centurion never brought Plaintiff Govan -- a man with an elevated PSA who was believed to have a family history of prostate cancer – to see a urologist to determine if he suffers from prostate cancer or other serious disease.

55.     Defendant Centene/Centurion failed to take any action to ensure Plaintiff Govan was seen by a specialist.

56.     On May 11, 2023, eight months after Plaintiff Govan's high PSA required referral to a urologist, Defendant Centene/Centurion, acting through Feeah M. Stewart CRNP, finally issued another referral for specialist healthcare from a urologist.

57.     Defendant Centene/Centurion noted that an "urgent consult" was needed yet failed to provide such consult.  As of July 1, 2023, the date that Defendant Centene/Centurion

relinquished contractual control over correctional health care in Delaware, Defendant Centene/Centurion had continually failed to provide Plaintiff Govan with essential health care.

58.     To date, neither the new health care contractual provider, Defendant VitalCore, nor the party presently responsible for ensuring inmates receive critical care, nor Defendants Taylor and Records, have acted to provide Plaintiff Govan his much needed and long-overdue visit with a urologist.   He continues to await the long-overdue visit to a urologist to learn if he has prostate cancer.

59.     Plaintiff Govan, aware that delay in seeing a urologist may result in untreated prostate cancer, filed grievance after grievance, exhausting all avenues available to him.  Yet Defendants denied his grievances, constantly refusing to take him to a urologist for a biopsy. Defendant Record participated in the wrongful denial of the grievances.

60.     Plaintiff **Desmond** suffers from significant chronic medical conditions:  high blood pressure, heart disease, high cholesterol, and kidney disease.

61.     Defendants knew Plaintiff Desmond had these chronic conditions and placed him in the Chronic Care Program.

62.     Yet despite knowing that Plaintiff Desmond suffered from these conditions, Defendants knowingly and intentionally refused to provide his prescribed blood pressure medications for 47 days.  Defendants withheld medically necessary medications as a form of discipline when Plaintiff Desmond refused to submit repetitive "sick calls" to receive prescribed medications.

63.     In addition to withholding medically necessary medication, Defendants failed to bring Plaintiff Desmond to see the cardiologist on a regular basis, as is required for the treatment of his heart disease.

13

64. Plaintiff Desmond is on a medication that increases the risk of skin cancer and a family history of colon cancer. Yet Defendants refused to bring Plaintiff Desmond to see a dermatologist to check for skin cancer or to have a colonoscopy.

65. Plaintiff Nathaniel Bagwell has been incarcerated for forty-one years. He presently serves his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977.

66. Plaintiff Bagwell suffers from significant, serious, chronic medical conditions arising from Defendants' failures and refusals to provide adequate care, including failure to provide prescribed medication, failure to treat a condition caused by correctional officer brutality, failure to complete required visits to specialists, and failure to treat mental health conditions. His chronic medical conditions include but are not limited to partial blindness due to cataracts and glaucoma, brain damage resulting from guard brutality, prostate disease, high blood pressure, heart disease, high cholesterol, diabetes, liver disease, and kidney disease.

67. Defendants' delays and denials in medical and diagnostic care have cost Plaintiff Bagwell his vision, as he is now approximately 98% blind. Defendants Centene/Centurion and Maduka knowingly and intentionally refused to provide timely and adequate treatment for Plaintiff Bagwell's cataracts and glaucoma. Not once, but twice, after necessary eye surgery performed by an outside provider, Plaintiff Bagwell was prescribed medical-grade eyedrops to assist healing and continued eye health. Both times, Defendants Centene/Centurion and Maduka withheld these medically necessary medications.

68. In addition to withholding medically necessary medication, all three Defendants refused to address the lack of adequate treatment for Plaintiff Bagwell's condition. Plaintiff Bagwell still presently has stitches and tubes remaining in his eyes from procedures that occurred

14

over four years ago. Yet all Defendants have repeatedly refused to address the ongoing harm caused by the inadequate treatment. As a result, Plaintiff Bagwell suffers from partial blindness.

69.    Plaintiff Bagwell suffered and continues to suffer directly from Defendants' negligence and deliberate indifference to his serious medical needs. He was deprived of constitutionally adequate medical care. All three Defendants also have failed to treat his other chronic conditions. Defendants delayed and denied medications and specialty care essential to the treatment of Plaintiff Bagwell's prostate disease, high blood pressure, diabetes, liver disease and kidney disease. Defendants also refuse to treat Plaintiff Bagwell's brain damage, diagnosed by a CAT scan, claiming the treatment would be too costly.

70.    Plaintiff Bagwell has a demonstrated ability to read and understand legal proceedings. His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class. He is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

71.    Plaintiff Jamie Baker has been incarcerated for eleven years. She presently serves her sentence at Baylor Women's Correctional Institution, 660 Baylor Blvd., New Castle, Delaware 19720. Plaintiff Baker suffers from cauda equina syndrome, Gier Bar syndrome and bipolar disorder.

72.    In 2018, Plaintiff Baker began to suffer from intense pain in her back and radiating down her legs, followed by an inability to walk or maintain her balance without assistance. Since 2020, Defendants Centene/Centurion and Maduka repeatedly refused to authorize the necessary specialist visits to a neurologist and refused to conduct ordered diagnostic tests such MRIs. Plaintiff Baker's condition continued to worsen, causing her to

15

endure extreme and unnecessary pain.  Defendants Centene/Centurion continued to deny specialist care or adequate medical treat which caused Plaintiff Baker to sustain numerous fall and resulting head injuries. Despite this, no adequate care or monitoring was administered. She made repeated requests for diagnostic and medical care to no avail.  Nor did Defendants Centene/Centurion and Maduka permit Plaintiff Baker to stay in the infirmary.

73.    When Defendant VitalCore took over the contract on July 1, 2023, it and Defendant Maduka continued the unconstitutional pattern of delaying and denying diagnostic testing and treatment.  Plaintiff Baker's condition continued to worsen, evidenced by extreme pain and constant imbalance, yet nothing was done for months.

74.    Finally, in February 2024, Plaintiff Baker was brought to a neurologist at Christiana Care, who had an MRI conducted.  She was immediately diagnosed with cauda equina syndrome and an infection of her nerves, and was rushed to the emergency room.  She was admitted to the hospital for eleven days as the physicians battled against the prospect that she would become completely paralyzed in her lower body. Had Plaintiff Baker's continued complaints and concerns regarding her health been addressed, and treatment not substantially delayed, her condition would not have worsened to the state of needing constant assistance to stand and navigate with a walker as a woman only in her fifties.

75.    After Plaintiff Baker was discharged and returned to Baylor, Defendants VitalCore and Maduka only allowed her to stay in the infirmary for one night.  Thereafter, Defendants VitalCore and Maduka again began to deny her adequate treatment.  Namely, Plaintiff Baker was directed by Christiana Care to return to see a neurologist within four weeks.  Yet Defendants VitalCore and Maduka did not send Plaintiff Baker to see a neurologist for 11

16

months.  In addition, they delayed filling her prescription of a medicine necessary to treat her nerve pain.

76.     Plaintiff Baker suffered and suffers directly from Defendants' negligence and deliberate indifference to her serious medical needs.  Defendants' failures and refusals to provide adequate medical treatment caused and cause Plaintiff Baker extreme and avoidable pain. Plaintiff Jamie Baker requires and is heavily dependent upon a walker to navigate and perform daily functions.  These conditions continue to worsen because Defendants VitalCore and Maduka continue to deny and delay specialist care.  Plaintiff Baker's claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

77.     Plaintiff Baker has a high school diploma, has enrolled in courses to achieve her associate's degree, and has demonstrated ability to read and understand legal proceedings.  She is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

78.     Plaintiff Gerald Bulat has been incarcerated for twelve years.  He presently serves his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977.

79.     Plaintiff Bulat suffers from diabetes, depression, borderline personality disorder, and substance abuse disorder.

80.     Defendants Centene/Centurion, VitalCore and Maduka knowingly and intentionally failed to provide Plaintiff Bulat with his necessary medications for his mental health and chronic conditions.  By way of examples, Defendants failed to provide him with his

prescribed Wellbutrin and denied corrective measures when his prescribed bipolar medication was creating suicidal ideations.

81.    Defendants also failed to provide Plaintiff Bulat adequate or timely mental health care despite Plaintiff Bulat filing multiple sick calls seeking help for his active drug addiction.

82.    Plaintiff Bulat suffered directly from Defendants' negligence and deliberate indifference to his serious medical needs.  He was deprived of constitutionally adequate medical care.  His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

83.    Plaintiff Bulat has a demonstrated ability to read and understand legal proceedings.  He is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

84.    Plaintiff Ronald B. Jackson has been incarcerated for nine years.  He presently serves his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977.  Plaintiff Jackson suffers from type II diabetes, gum disease, anxiety and sleep disorders. All three Defendants failed to provide Plaintiff Jackson with his prescribed diabetes medications on multiple occasions.

85.    From April 1, 2020 to the present, Defendants failed to maintain an adequate inventory, and as a result, Plaintiff Jackson and other diabetics were forced to go without their prescribed medications.

86.    Defendants VitalCore and Maduka failed to respond to a medical emergency suffered by Plaintiff Jackson.  On August 8, 2024, a nurse gave Plaintiff Jackson insulin without providing the necessary stabilizer (e.g. food snack or gel) to prevent his blood sugar from dropping too low.  Without the stabilizer, Plaintiff Jackson's blood sugar dropped too low and he

18

fainted in his cell, gashing his head, face, jaw nose and mouth against the concrete floor. His eye was swollen shut, his lips were cut and swollen and his face was gashed open and bleeding. Nobody provided medical attention or called a code for the emergency.

87. When Plaintiff Jackson recovered consciousness, he asked for medical attention and was told he had to file a sick call, but no sick call slips were available. Despite later filing sick call slips, Plaintiff Jackson did not receive any adequate attention whatsoever to his injuries. He was denied an X-ray scheduled for August 26, 2024, and only received attention after he grieved the failures to provide care.

88. He eventually was prescribed Neurontin for nerve damage caused by the fall. Yet, Defendants VitalCore and Maduka continue to fail to provide the prescribed medication on a consistent basis. Nor to date has he been given a CAT scan to check for internal damage. He has also been continually denied specialist care in the form of a podiatrist to treat his diabetic-related foot issues.

89. Plaintiff Jackson was forced to endure an open wound until it scarred over and closed on its own. He lost and has not regained feeling in his lips. As a result of his serious injuries being ignored, Plaintiff Jackson's mental health deteriorated to the point he requested help from mental health within the facility. Plaintiff Jackson was denied a mental health provider for over a year and a half, despite continued requests. It was not until a 2024 altercation with a correctional officer that he was finally granted access to mental health services within the facility.

90. Defendants Centene/Centurion and Maduka failed to provide Plaintiff Jackson with any dental care whatsoever. Plaintiff Jackson, in his decade of incarceration, has never been seen by dental for his regular cleanings. This resulted in a recent diagnosis of gum disease.

19

91.    The failures of Defendants Centene/Centurion, VitalCore and Maduka to respond to Plaintiff Jackson's serious medical needs caused and continues to cause physical damage. Plaintiff Jackson continues to suffer from constant headaches and pain when chewing.

92.    Plaintiff Jackson suffered directly from Defendants' negligence and deliberate indifference to his serious medical needs.  He was deprived of constitutionally adequate medical care.  His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

93.    Plaintiff Jackson has a high school diploma and has demonstrated ability to read and understand legal proceedings.  He is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

94.    Plaintiff Michael Taylor has been incarcerated for thirty-six years.  He presently serves his sentence at James T. Vaughn Correctional Center, 1181 Paddock Road, Smyrna, Delaware 19977.  Plaintiff Taylor suffers from HIV (which was his only medical condition upon incarceration), hypothyroidism, anemia, high blood pressure, spinal stenosis, six herniated discs in his back and five herniated discs in his spine, pinched nerves, osteoarthritis, a double inguinal hernia, MGUS, pulmonary fibrosis, and type 2 diabetes.  He also had kidney stones.

95.    Defendants VitalCore and Maduka knowingly and intentionally failed to provide Plaintiff Taylor with the diagnostic testing, treatment and medications needed to control his multiple medical conditions.  As a result, Plaintiff Taylor has and continues to suffer from avoidable pain and worsening disease states.

96.    Although outside medical professionals and providers have informed Plaintiff Taylor that he should undergo surgery for his herniated discs, pinched nerves, and hernia removal, Defendants deny and delay such medical procedures.

97.     Most alarmingly, Defendants VitalCore and Maduka have failed to provide Plaintiff Taylor with the necessary treatment and medications for his type II diabetes.  This has caused Plaintiff Taylor's blood sugars to remain too high, which in turn has prevented him for receiving recommended corrective surgery for his neck and back and for his growing hernia on his lower abdomen.

98.     Defendants VitalCore and Maduka also failed to provide Plaintiff Taylor with the necessary medications for his pulmonary fibrosis for more than a month after his diagnosis.  In addition, they delayed removing non-dissolvable stiches from his face (after a fibrosis lesion was removed) for more than 18 days because Defendant VitalCore's employee could not find a scalpel.

99.     Defendants VitalCore and Maduka also refused to provide a therapeutic mattress and leg wides to address his back pain.  Defendant VitalCore's employee told him that Defendants did not want to set a precedent of providing such therapeutic items to aging offenders.

100.    Plaintiff Taylor suffered directly from Defendants' negligence and deliberate indifference to his serious medical needs.  He was deprived of constitutionally adequate medical care.  His claims are typical of the claims of the class because they arise from the systemic understaffing and meritless delays in diagnosis and treatment that damage the entire class.

101.    Plaintiff Taylor has a demonstrated ability to read and understand legal proceedings.  He is willing and able to serve as a class representative on behalf of all those who have had necessary medical care wrongfully delayed or denied.

102.

103.    In addition to the eight representative Plaintiffs, numerous other inmates suffered from unmerited delays and denials of medical care.

104.    A few examples follow:  A man has incarcerated at Vaughn developed an inguinal hernia, a painful and dangerous condition in which soft tissue bulges through the abdominal muscles.  Defendants told him that he needed to be seen by a specialist and receive surgery to treat the inguinal hernia yet never provided the specialist care or required surgery.  Defendants also failed to provide him with either his prescribed post-surgical eye drops or his required follow up visit with the eye surgeon.

105.    A man incarcerated at Howard R. Young Correctional Center ("Young") began to suffer severe and unexplained pain in his left knee.  Defendants brought Mr. Anderson to a medical provider, who ordered that he be given an MRI to diagnose the reason for the pain in the knee.  But Defendants refused to provide the prescribed MRI, leaving the man in continual pain with increasingly impaired mobility.

106.    A man incarcerated at Sussex Correctional Institution ("Sussex") with burning pain in his penis and groin was told by Defendants that he needed to be seen by a urologist.  But Defendants then delayed and denied the necessary specialist consultation.

107.    A man incarcerated at Vaughn began to experience severe ear pain and loss of hearing.  He submitted multiple sick calls and after significant and unmerited delays was seen by Defendants but no treatment was provided.

108.    A man incarcerated at Vaughn suffered from severe brain damage, seizures and heart issues after being badly beaten.  Yet Defendants refused to provide him any care for his serious medical issues.

22

109.    A man incarcerated first at SCI and then at Vaughn was sexually assaulted by another inmate and sought medical care for the resulting injuries. Defendants failed to provide him with care.

110.    A man was told by Defendants' staff that he needed a CT scan of his abdomen and pelvis to diagnose the cause of his serious and worsening gastrointestinal problems. Yet Defendants refused to provide the needed CT scan.

111.    A man suffered from post-traumatic stress disorder ("PTSD") and depressed personality disorder after being sexually assaulted in a New Jersey prison. Defendants failed to provide any medical care, instead placing him in darkened confinement for 22.5 hours per day.

112.    A man incarcerated at Vaughn needed oral surgery. Defendants brought him to Christiana Hospital for surgery, but they had misspelled his name and provided an inaccurate birthdate. Their incompetence or maliciousness led to Christiana not being able to perform the needed surgery. Defendants then failed to bring him back for the surgery.

113.    A man incarcerated at Vaughn suffered from mental illness and opioid addiction. Although he was prescribed medication-assisted treatment ("MAT") and Wellbutrin for his disease, Defendants refused to provide the medication.

114.    A man incarcerated at Vaughn walked with a cane and was in constant pain due to a faulty hip replacement. Defendants took away his cane and refused to schedule him for the surgery needed to treat his hip.

115.    A man incarcerated at Vaughn has been diagnosed with prostate cancer, spinal stenosis and herniated discs. Defendants failed to treat his serious medical conditions.

23

116.    A man incarcerated at Vaughn suffered as stroke and massive heart attack.  After he was resuscitated several times, he needed surgery.  Defendants delayed and denied him the needed surgery.

117.    A man incarcerated at Vaughn needs surgery to address fluid around his heart and bladder.  Defendants delayed and denied him the needed surgery.

118.    A man incarcerated at Sussex developed a severe infection.  Defendants failed to treat the infection.

119.    A man incarcerated at Sussex had hepatitis C and a cardiac condition.  Defendants refused to provide his required medications, claiming they did not need to treat him at all because he was not going to be detained for long.

120.    A man incarcerated at Vaughn suffers from bi-polar schizophrenia and attention deficit hyperactivity disorder ("ADHD").  Defendants refused to provide his prescribed medication, withholding it as a form of discipline.

121.    A man incarcerated at Sussex suffers from penis blockage.  Defendants failed to bring him to his medical appointments and delayed and denied him access to a required colonoscopy.

122.    A man incarcerated at Vaughn suffers from prostate issues.  Defendants have admitted that he needs to see a urologist but have delayed bringing him for specialist care.

123.    A man incarcerated at Vaughn suffers from severe hernias and has a colostomy.  Defendants have refused to allow him to see a specialist despite swollen bowels and pain.

124.    A man incarcerated at Vaughn suffers from serious mental illness with the same four diagnoses since childhood.  Yet Defendants refused to treat him and refused to provide his prescribed medications.

125.    A man incarcerated at Sussex suffers from significant pain in his back and legs. Defendants delayed responding to his sick calls and failed to provide any diagnosis or treatment.

126.    A man incarcerated at Vaughn had to file repeated sick calls to be seen. Defendants diagnosed him but failed to treat his serious medical issue.  Instead, they threatened him with disciplinary action if he submitted another sick call.

127.    A man incarcerated at Sussex has asthma.  Defendants refuse to provide him with his necessary treatment with a resulting deterioration in his lungs.

128.    A man incarcerated at Vaughn has kidney disease and needs dialysis.  Defendants failed to provide timely treatment.

129.    A man incarcerated at Vaughn suffered from a serious infection in his foot. Defendants told him that they did not have any doctors at the institution and failed to treat his infection, causing avoidable pain and injury.

130.    A man incarcerated at Sussex suffers from opioid addition and PTSD from sexual abuse.  Defendants failed to provide medication-assisted treatment ("MAT") for the addiction and refused to allow him to shower privately as treatment for his PTSD.

131.    A man incarcerated at Sussex has nerve damage in his hands and feet.  Defendants have refused to provide him with a medically-necessary surgery.

132.    These are but a few examples of the Defendants' systemic wrongdoing. Reasonable discovery will establish that Defendants have shortened the lives of hundreds of incarcerated persons and caused unnecessary pain to hundreds of others.

## THE GOVERNMENTAL DEFENDANT HAS BREACHED HER DUTY TO PROVIDE ADEQUATE HEALTH CARE

133.    Defendant  Maduka Ezeh has a constitutional and statutory duty to provide medical care to those who are sentenced to confinement by the State of Delaware.

25

134.    Chapter 65 of Title 11 of the Delaware Code sets forth the Defendant's obligation to provide medical care to persons committed to its custody.  11 Del. C. § 6536 (a) provides that the Department of Corrections "shall promulgate reasonable standards, and shall establish reasonable health, medical and dental services, for each institution, including preventative, diagnostic and therapeutic measures on both an out-patient and hospital basis for all types of patients."  The Defendant is required to be personally involved in the design and administration of the health care system: "The nature and extent of such medical and dental services shall be determined by the Commissioner of Correction in consultation with the Bureau Chief of Correctional Healthcare Services."

135.    The Defendant cannot eliminate her  own duties towards Plaintiffs and the plaintiff class by using Defendants Centene/Centurion and VitalCore to deliver that health care. *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody , and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights.")

As evidenced by the delays and denials of health care endured by Plaintiffs and the proposed Class, the Defendant has systemically violated her duties to ensure adequate health care.  She failed to supervise the corporate Defendants and failed to call for the termination of the contract for cause, as was merited by the systemic denial of specialized care and surgeries, and the pattern of meritless and lengthy delays in providing care.

136.    Defendant Maduka-Ezeh failed to supervise the corporate Defendants and failed to call for the termination of the contract for cause, as was merited by the systemic denial of specialized care and surgeries, and the pattern of meritless and lengthy delays in providing care.

26

Reasonable discovery will show that Defendant Maduka-Ezeh admitted under oath that the corporate Defendants failed to provide the required medical care and failed to maintain the required medical records.

137.    At present, DefendantMaduka-Ezeh continues to fail to supervise Defendant VitalCore and needs to be enjoined from continued malfeasance.  Defendant allowed the company to hire all the same staff that worked in the prisons under Defendant Centene/Centurion despite being knowing that those staff members systemically and negligently denied and delayed health care to Plaintiffs and the proposed plaintiff class.  Defendant is allowing VitalCore to continue to delay and deny Plaintiffs and the proposed plaintiff class necessary medical diagnoses and treatment for serious medical conditions.

138.    Defendant Maduka-Ezeh failed to supervise the corporate defendants and instead allowed them to delay and deny care to Plaintiffs and proposed plaintiff class.   By failing to supervise, Defendant Maduka-Ezeh acted negligently and breached a duty of care to Plaintiffs and the Class.

139.    Instead of undertaking an adequate investigation and remedying the glaring deficits, Defendant Maduka-Ezeh continues to participate in consistently denying Plaintiffs and the proposed plaintiff class adequate and timely health care.

**DEFENDANT CENTENE WHOLLY OWNED AND CONTROLLED DEFENDANT CENTURION**

140.    On November 14, 2019, Delaware's Department of Corrections ("DOC") issued a request for proposal No. DOC20026-Healthcare seeking a company willing to replace its prior prison health care provider.

141.    In order to submit a bid on this contract, seven days later, on November 21, 2019, Defendant Centene created a wholly-owned and controlled company called Centurion of Delaware.

142.    Defendant Centene created this entity and completely controlled its operations in order to submit a bid on Delaware's prison health contract and continued to control and operate this company throughout the time period relevant to this lawsuit.  Throughout the timeframe when Centurion of Delaware LLC provided correctional health care services to the Department, it did not act as an independent company providing services but instead was wholly controlled and operated by Centene, as evidenced by facts in Centene's filings with the Security and Exchange Commission ("SEC").  Defendant Centene reincorporated in Delaware to serve as a holding company for its health care operations.  Centene's SEC 2022 Form 10-K for Centene at 1.

143.    Defendant Centene considered its workforce a single entity – "the integrated human capital component of our annual operating plans." *Id.* at 16.  Defendant Centene offered standardized development programs through Centene University.  Id.

144.    Defendant Centene centralized oversight of its medical programs, using "real-time operational dashboards, tracking numerous quality key performance metrics." *Id*. at 7.

145.    Defendant Centene also operated a single, unified corporate compliance program. The corporate compliance department was responsible for developing, implementing and monitoring its employees' compliance with state and federal law governing the company's provision of health care services.  *Id*. at 9.

28

146.    During the time period relevant to this lawsuit, Defendant Centene's Board of Directors' Audit and Compliance Committee personally reviewed the reports generated by the compliance department.  *Id.* at 9.

147.    Defendant Centene increased its revenues by 22 percent as compared to 2021, partly as a result of "new contracts in our correctional business."  *Id*. at 48.

148.    Defendant Centene immediately recognized Defendant Centurion's revenues "when the related services are provided or as ratably earned over the covered period of services."  *Id.* at 57; *see also id*. at 71.  In other words, Defendant Centurion revenues were actually and immediately  Defendant Centene's revenues.

149.    Reasonable discovery will show that Defendant Centurion did not keep separate financial books able to be audited by KPMG LLP, Defendant Centene's accounting firm since 2005.

150.    In short, Defendant Centene controlled all of Defendant Centurion's conduct and is equally liable for the repeated constitutional and statutory violations that damaged Plaintiffs and the Plaintiff Class.  For that reason, Defendants are referred to as "Defendant Centene/Centurion" until the date Defendant Centene sold Centurion to an undisclosed buyer.

## DEFENDANT CENTENE/CENTURION ACTED WITH DELIBERATE INDIFFERENCE BY INTENTIONALLY DELAYING AND DENYING HEALTH CARE FOR SERIOUS MEDICAL NEEDS

151.    Defendant Centene/Centurion voluntarily competed to win the Department's health care contract and won the DOC prison healthcare services contract, which began on April 1, 2020 and terminated on June 30, 2023. According to the contract, Centurion of Delaware, LLC was to be paid $47.8 million for the first year of the contract, with annual increases built into the contract.

29

152.    Defendant Centene/Centurion knew that that running the correctional health care system involved hiring competent staff, supervising staff, and terminating those who systemically violated the rights of the incarcerated by delaying and denying medical care for serious medical issues.

153.    In fact, payment under the contract was subject to certain "withholds" that the DOC reserved based upon Defendant Centene/Centurion's compliance with certain provisions of the contract. One of these "withholds" was a "Staffing Withhold." The contract included a "Staffing Matrix" which required Defendant Centene/Centurion to maintain certain staffing levels for medical and administrative personnel at the state's correctional facilities.

154.    Defendant DeMatteis awarded the contract to Defendant Centene/Centurion, emphasizing in the press release that Defendant's superior staffing was a basis for the award of the contract. "Where our current provider might have a nurse practitioner in the role, Centurion wants a physician. Where our current provider might have a psychologist with a masters degree, Centurion wants to fill that with a PhD psychologist."

155.    The contract spelled out the elements required to provide "comprehensive healthcare Services to all inmate in DDOC custody and reflected on the ADP ("Inmates") regardless of sentencing status."  See DOC – Centurion Contract at Appendix 1-23.

156.    Defendant Centene/Centurion had to provide and pay for comprehensive healthcare services for inmates, including medical, nursing, ancillary, dentary and pharmacy managements services.  These services had to be provided both in infirmary and outpatient settings.

157.    Defendant Centene/Centurion were obliged to ensure inmates received needed specialist consultations, as well as emergency transportation and in-patient hospital services.

158.    Defendant Centene/Centurion had to set up a hospital network and ensure inmates had emergency health services available twenty-four hour per day, every day.  With the exception of services covered by Medicaid, the Defendant Centene/Centurion was responsible for paying for all such hospital care.

159.    Defendant Centene/Centurion promised to provide on-site diagnostic, laboratory and radiology services.

160.    Defendant Centene/Centurion promised to provide timely notice of test results. As set forth in Appendix 1-25, Paragraph 9.4.h, the contract expressly required timeliness: "Establish a system that ensures that, in the event a laboratory or radiology test with results outside the 'normal' range, a provider notified the inmate, explains the results and develop a plan of care in a timely manner.  Timeliness will be as defined by the condition identified by the abnormal diagnostic test, the inmate's overall health, and available treatment modalities."

161.    Defendant Centene/Centurion had to hire, train and supervise sufficient staff to provide these comprehensive healthcare services in a timely fashion.

162.    To the extent that the services could not be provided by employees, Defendant Centene/Centurion agreed to develop a system for specialist consultations and offsite diagnostic testing that "[e]nsures timely access to specialist care and diagnostic services for those inmates who need them."  Appendix 1-26, Paragraph 9.7. a.

163.    This system was also required to be "physician-driven such that only a physician may determine requested care to be medically unnecessary or inappropriate . . .  and only a physician may redirect care."  Appendix 1-26, Paragraph 9.7.d.

164.    As evidenced by the systemic delays and denials of medical care experienced by Plaintiffs and the proposed plaintiff class, Defendant Centene/Centurion systemically and

31

blatantly violated the contract terms and Delaware law, as well as the Eighth and Fourteenth Amendments.

165.    Defendant Centene/Centurion understaffed the correctional health care system by failing to hire the necessary medical professionals.  Defendant Centene/Centurion lacked physicians, nurses, dentists, medical directors and countless other needed professionals, as is evidenced by numerous job postings seeking staff throughout the period April 1, 2020 to June 30, 2023.

166.    Defendant Centene/Centurion failed to supervise the staff it did have and retained staff known to have violated the rights of Plaintiffs and the proposed class.  As but one example, Defendant Centene/Centurion placed a man without a nursing license into the role of nurse.

167.    Reasonable discovery is needed to establish the full extent of the lack of supervision and wrongful retention as well as the full extent of the profits made by Defendant Centene/Centurion through its deliberate and systemic failure to supervise and failure to terminate unqualified persons.

168.    Defendant Centene/Centurion routinely denied Plaintiffs and the plaintiff class with medically-necessary specialist care.  Reasonable discovery will show Defendant did so as a way to increase the profitability of the contract.

169.    Defendant Centene/Centurion engaged in the wrongful practice of denying meritorious medical grievances without sufficient, or sometimes any, investigation.

170.    In the correctional health care industry, the National Commission on Correctional Health Care ("NCCHC") is the primary accrediting agency. The NCCHC performs periodic, pre-announced audits of correctional facilities to ensure that each facility seeking accreditation meets minimum, baseline criteria for accreditation.

171.    On multiple occasions throughout Defendant Centene/Centurion's tenure as the DOC's correctional health care provider, correctional facilities were found to be out of compliance with the NCCHC's baseline standards and required "corrective action."

172.    After two years of taking Delaware's money without fulfilling the contract terms or the legal duties to provide medical care, Defendant Centene cashed in the profits made by violating the rights of the Plaintiffs and the proposed class.  Defendant Centene intended that its stock price benefit from the divestment of Defendant Centurion.  Centene's SEC 2022 Form 10-K for Centene at 31 and 32.

173.    On or about January 10, 2023, Defendant Centene signed and closed a definitive agreement to divest Defendant Centurion, its prison health care business.  *Id.* at 38, 43 and 76. Defendant Centene received $236 million from an undisclosed buyer.  *Id.* at 76.

174.    Reasonable discovery about the January 2023 divestment is needed to determine if Defendant Centene retained a minority equity ownership, financial or performance guarantees, indemnities or other buyer obligations, as is its practice. *Id.* at 31.

175.    Reasonable discovery is needed to establish the full extent of profits made by Defendant Centene/Centurion that are attributable to its deliberate and systemic understaffing of the Department's health care services.

176.    From January 11, 2023 through July 1, 2023, the Centene spin-off called Centurion was responsible for providing health care services in Delaware prisons.   During this six-month period, Defendant Centurion continued the past practices of acting with deliberate indifference, delaying and denying health care for serious conditions.

177.    Defendant Centurion continued its past practices of failing to hire sufficient staff and failing to supervise the staff it did have.

33

178.    Defendant Centurion continued its past practices of retaining unqualified and incompetent staff, including using as a nurse a man without a license.

## DEFENDANT VITALCORE IS ACTING WITH DELIBERATE INDIFFERENCE BY INTENTIONALLY DELAYING AND DENYING HEALTH CARE FOR SERIOUS MEDICAL NEEDS

179.    On January 10, 2023, the very same day Defendant Centene announced its divestment, the Department held a pre-bid meeting open to those companies interested in bidding on Delaware's prison health care services contract.

180.    One of the companies attending the meeting was Defendant VitalCore Health Strategies LLC, a company headquartered in Topeka, Kansas and run by a former health care consultant named Viola Riggin.  Riggin began VitalCore as a consulting company but in 2019 transformed her company into a prison  health care company.

181.    Defendant VitalCore's website claims it grew rapidly and reveals that it won prison health care contracts in multiple states.

182.    Two VitalCore employees or agents attended the January 10, 2023, meeting: Timothy Keck and Charles Simmons.  Both attended not only the 10am meeting but also the tour provided by the Department.

183.    Twelve companies in addition to Defendants VitalCore and Centurion attended the pre-bid meeting, including Christiana Care, one of Delaware's largest health care systems.

184.    But the Department, for reasons that will be learned through reasonable discovery, made it difficult for companies to bid, insisting that all bids must be submitted within less than one month.  The Department refused all requests for extensions.

185.    As a result, only four companies submitted bids:  Centurion, VitalCore, Wexford Health Services and YesCare.

34

186.    In order to bid on the Delaware correctional health care contract, on January 23, 2023, Defendant VitalCore filed the paperwork to create a Delaware LLC.  In this filing, the company age is listed as "four months" and the registered agent is the Corporation Trust Company.

187.    Defendant VitalCore won the prison health care services contract.  Defendant VitalCore assumed responsibility for the health care in all Delaware prisons effective July 1, 2023.

188.    On or about May 1, 2023, the Department's manager of support services, Craig Fetzer, memorialized Delaware's award of the prison health care contract to VitalCore Health Strategies, LLC in a document entitled AWARD NOTICE, CONTRACT NO. DOC23026-HEALTHCARE.

189.    The contract provided that the contract shall run from May 1, 2023 through June 30, 2026.  The first two months (May 1, 2023 through June 30, 2023) were labeled a "transition period" for which VitalCore was paid $209,458.00.

190.    Defendant VitalCore employees began traveling to Delaware during the week of May 15, 2023 and meeting with Centurion's employees staffing the prisons.

191.    Reasonable discovery will show that during the transition period, Defendant VitalCore had unfettered access to the operations and records of the existing prison healthcare system, including but not limited to, personnel records, staffing records, unfilled position descriptions, grievances filed, records regarding use of outside specialists, and records regarding sick calls submitted and timing of responses.

192.    In short, Defendant VitalCore knew that Delaware prisons lacked a functional health care system and knew that dramatic measures were needed to conform to the Constitution of the United States and Delaware law.

193.    Yet Defendant VitalCore did not take any steps, let alone the needed dramatic steps, to improve the dismal lack of care in Delaware prisons.  Instead, Defendant VitalCore simply hired *all* the existing staff that had failed so woefully under Centene's supervision.

194.    According to a public "welcome" letter, Defendant VitalCore's Chief Executive Officer Viola Riggin wanted to "ensure we maintain the hard-working staff that provide great care to our patient population."  She guaranteed employment to the very health care providers who had failed to provide timely and competent care, stating in the public welcome letter: "***Please know that your job is safe and secure for those working in the facilities***."  (emphasis added; letter obtained from VitalCore website.)

195.    To date, Defendant VitalCore has failed to remedy the constitutional and statutory failings of Delaware's prison health care system despite being promised almost $148 million over three years to do so.

196.    Defendant VitalCore continues to understaff the system.  Website job postings from VitalCore obtained in mid-July 2023 revealed that VitalCore was operating without necessary staff, including but not limited to registered nurses, medical directors, a chief psychologist, electronic health record specialist, charge nurses, infection prevention registered nurse, utilization management nurse, psychiatric nurse practitioner and physicians.

197.    Defendant VitalCore continues to fail to supervise the existing staff and continues to retain unqualified staff who have been involved in past and ongoing violations of the constitutional and statutory violations of the rights of Plaintiffs and the proposed plaintiff class.

36

198.    Reasonable discovery will show Defendant VitalCore routinely denied Plaintiffs and the plaintiff class with medically-necessary specialist care.  Reasonable discovery will show Defendant did so as a way to increase the profitability of the contract.

199.    Reasonable discovery will show Defendant VitalCore repeatedly failed to provide necessary medications in a timely fashion.

200.    Reasonable discovery will show Defendant VitalCore ignored, failed to investigate and denied the vast majority of grievances filed about the delay and denial of medical care.  Defendant VitalCore failed to operate a grievance process capable of redress, as it was obliged to do by both law and contract to do.

**CLASS ACTION ALLEGATIONS**

201.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of themselves and a class of similarly situated individuals.

**PROPOSED CLASS AND SUBCLASS DEFINITIONS**

202.    Plaintiffs propose that the court certify at least three classes defined as follows: F.R.C.P. 23(b)(2) LEVEL V INJUNCTIVE CLASS:  All individuals presently confined, or who will be confined in the future, in Level V facilities in Delaware who seek or sought access medical, mental health or dental diagnostic services or treatment for serious medical conditions. F.R.C.P. 23(b)(1) (A) CENTENE/CENTURION LEVEL V NOMINAL AND PUNTIVE DAMAGES CLASS:  All individuals who were incarcerated in Level V facilities and sought access to medical, mental health or dental diagnostic services or treatment for serious medical conditions between April 1, 2020 and June 30, 2023.

203.    F.R.C.P. 23(b)(1) (A) VITALCORE NOMINAL AND PUNITIVE DAMAGES CLASS:  All individuals incarcerated in Level V facilities who sought access to medical, mental

37

health or dental diagnostic services or treatment for serious medical conditions between July 1, 2023 and the earlier of the trial of this action or the termination of VitalCore as the DOC's contractual healthcare provider.

204.    This action is brought, and may properly be maintained, as a class action because it satisfies the numerosity, commonality, typicality and adequacy requirements for maintaining a class action under Rule 23.

205.    *Numerosity*: The proposed class is so numerous that joinder is impracticable. The class meets the numerosity requirement of Rule 23(a)(1).  Delaware houses more than 3500 incarcerated persons in its prisons.   Thousands of these incarcerated persons sought medical care during the time period April 1, 2020 to present.

206.    Reasonable discovery will show the vast majority of these persons were forced to endure unnecessary and dangerous denials or delays of needed specialist care, medications, evaluation and treatment.

207.    *Commonality*:  The class meets the commonality requirements of Rule 23(a)(2). All Defendants have a duty under the Eighth and Fourteenth Amendments to the United States Constitution to provide humane conditions of confinement and to provide health care.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Bell v. Wolfish*, 441 U.S. 520, 560-61 (1979).

208.    The class shares common question of law and fact including, but not limited to:

Whether Defendants operated a constitutionally inadequate health care system;

Whether Defendants unreasonably delayed medical care;

Whether Defendants unreasonably denied medical care;

Whether Defendants unreasonably delayed or failed to provide necessary medications;

 Whether Defendants unreasonably delayed or denied specialist care;

38

Whether Defendants chronically understaffed the health care system despite knowing that such understaffing would result in the unconstitutional delay and denial of treatment for serious medical needs;

Whether Defendants failed to design and administer an effective system of redress for grievances relating to the delay or denial of medical care;

Whether Defendants withheld or denied medical care as a form of discipline;

Whether Defendants' deliberate indifference to those owed a duty of care violated the Eighth and Fourteenth Amendments;

Whether Defendants' deliberate indifference to those owed a duty of care arose from negligent hiring, staffing and supervision; and

Whether Defendants' deliberate indifference to those owed a duty of care damaged the class.

209.    *Typicality*:  The proposed class meets the typicality requirements of Rule 23(a)(3). The claims of all class members arise from their incarceration and their total reliance on Defendants to provide necessary health care.  The Plaintiffs and all class members were deprived of constitutionally adequate medical care because of Defendant's deliberate indifference and negligence.  The claims of the Plaintiffs are typical of the claims of the class because their claims arise from the same policies, practices, and courses of conduct and their claims are based on the same theory of law as the class claims.

210.    Adequacy:  The proposed class meets the adequacy requirements of Rule 23(a)(4) because the named Plaintiffs will fairly and adequately protect and represent the interests of the classes.  The named Plaintiffs have no interests adverse to or in conflict with the class members whom they propose to represent.  In addition, named Plaintiffs are represented by counsel who

39

are experienced and competent in the prosecution of cases arising from civil rights violations of individuals in custody.

211. The named Plaintiffs will fairly and adequately represent the interests of the class. Each suffered from delayed or denied medical treatment during the relevant time period.

212. A class is maintainable here under Rule 23(b) (1), (2) and (3).  Plaintiffs allege that all the requirements of these Rules are met.  Failure to certify a class would result in inconsistent adjudications and incompatible standards, Defendants have acted on grounds that apply to the entire class, and common questions of law and fact predominate over any question affecting only individual members.

213. Plaintiffs and members of the proposed class have suffered and will continue to suffer grave and irreparable harm unless the Court orders Defendants to provide timely medical care for serious medical needs.

**COUNT I:  42 U.S.C. §1983 – VIOLATIONS OF EIGHTH AND FOURTEENTH AMENDMENTS**

214. Each of the foregoing paragraphs is hereby incorporated by reference as if fully set forth.

215. By the practices described herein, Defendants subjected Plaintiffs and the proposed class to serious harm and injury from constitutionally delayed and denied health care.

216. Defendants caused the deprivation of rights secured by the United States Constitution under the Eighth and Fourteenth Amendments.

217. Defendants' conduct in unreasonably delaying and denying medical care constitutes deliberate indifference to the Plaintiffs' and proposed class members' serious medical needs and causes unnecessary and wanton infliction of pain in violation of the Eighth and

Fourteenth Amendments' prohibition on cruel and unusual punishment.  Defendants' conduct was systemic and intentional.

218.    The corporate Defendants' conduct was part of an overall strategic approach to maximizing profits by pursuing policies and practices that had the foreseeable effect of delaying and denying health care in violation of the patients' Eighth and Fourteenth Amendment rights.  Defendants' conduct reflected a custom or policy of violating Plaintiff's Eighth Amendment rights.

219.    Because of Defendants' deliberate indifference, Plaintiffs and class members have suffered and will continue to suffer irreparable injury, including decreased life expectancy, physical pain and suffering, mental anguish and emotional distress.

220.    Defendacts acted with recklessness and callous indifference to Plaintiffs' and the class' Constitutional right to health care.  Defendants VitalCore and Centene/Centurion also acted with an evil intent to make a greater level of profit by depriving Plaintiffs and the class of health care required by the Constitution.

221.    At all times relevant to this Complaint, Defendants knew they were acting in a manner that deprived Plaintiffs and the class of their Constitutional right to health care.  Among other facts, the constant flow of grievances about the failures of the health care delivery put Defendants on notice of the deprivations.

**COUNT II AGAINST DEFENDANTS CENTENE/CENTURION AND VITALCORE: NEGLIGENT HIRING, SUPERVISION AND RETENTION**

222.    Each of the foregoing paragraphs is hereby incorporated by reference as if fully set forth.

223.    Defendants' negligent hiring, supervision and retention harmed Plaintiffs and the proposed class.  Delaware recognizes a cause of action for negligent supervision, hiring and

administration claims, and does not require an affidavit for such claims. *See Sanders v. Centurion LLC*, 319 A.3d 307 (De 2024) (table), citing with approval *Sadler v. Nanticoke Memorial Hospital*, 2012 WL 6846550 (Sup. Ct. De).

224.    Defendant Maduka-Ezeh owed a duty of care to Plaintiffs and the class. Defendant Maduka-Ezeh breached that duty and caused harm to Plaintiffs and the class by negligently failing to supervise Defendant Centene/Centurion and Defendant VitalCore. In her position, she was responsible for ensuring that the Corporate Defendants did not deny medical care and did not delay medical care as a means to increase their profitability. She failed to fulfill those supervisory responsibilities.

225.    Reasonable discovery also will show that Defendant Maduka-Ezeh was involved in the decision to hire and to retain Defendant Centene/Centurion and Defendant VitalCore, and acted negligently in that decision-making process. . Defendant Maduka-Ezeh's negligence in hiring and retaining breached her duties to plaintiffs and the proposed class.

226.    Defendant Centene/Centurion acted negligently and breached its duty of care to Plaintiffs and the proposed class by hiring, failing to supervise and retaining persons without the requisite competency in correctional medical services, including persons who had repeatedly violated the rights of those in custody.

227.    Defendant VitalCore acted negligently and breached its duty of care to Plaintiffs and the proposed class by hiring, failing to supervise and retaining persons without the requisite competency in correctional medical services, including persons who had repeatedly violated the rights of those in custody.

228.    As a result of Defendants' negligence in hiring and supervision, Plaintiffs and class members have suffered and will continue to suffer irreparable injury, including physical pain and suffering, mental anguish and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiffs request that this Court:

A.  Certify the case as a class action on behalf of the proposed class;

B.  Appoint the undersigned counsel as Class Counsel;

C.  Designate the Named Plaintiffs as representatives of the class;

D.  Declare that Defendants' deliberate indifference violated the rights of the Plaintiffs and all members of the proposed classes under the Eighth and Fourteenth Amendments;

E.  Declare that the Corporate Defendants' negligence in hiring, supervision and retention breached duties of care to Plaintiffs and all members of the proposed classes;

F.  Enter an injunction enjoining Defendant Maduka  and Defendant VitalCore from continuing to subject Plaintiffs and the class to unlawful and unconstitutional delays and denials of treatment described herein;

G.   Enter injunctive orders as are necessary and/or appropriate to preclude such conduct on an ongoing basis, including but not limited to an injunction prohibiting the use of for-profit companies to provide correctional health care services and an injunction ordering sentence reductions;

H.  Enter judgment against Defendants Centene/Centurion and VitalCore awarding the Named Plaintiffs and the proposed class compensatory (including nominal) and

43

punitive damages to compensate for the past unconstitutional delays and denials of medical care;

I.  Enter judgment against Defendants Centene and Centurion awarding the Named Plaintiffs and the proposed class punitive damages in an amount equal to the disgorgement of profits earned by Defendants Centene and Centurion through sustained and wrongful understaffing of the Delaware prison health care system.

J.  Enter judgment awarding costs and reasonable attorneys' fees and costs in this action as provided in 42 U.S.C. § 1988(b); and

K.  Grant Plaintiffs and the class such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury.

Respectfully submitted,

WHITEFORD, TAYLOR & PRESTON, LLC

/s/ *Daniel A. Griffith*
Daniel A. Griffith, Esquire (#4209)
Susan L. Burke (#6973)
600 N. King Street, Suite 300
Wilmington, DE  19801
P:  302-357-3254
F:  302-357-3274
Email:  dgriffith@whitefordlaw.com
Email:  sburke@whitefordlaw.com

ACLU DELAWARE

44

/s/*Dwayne S. Bensing*
Dwayne S. Bensing (#6754)
100 W. 10th Street, Suite 706
Wilmington, DE  19801
Email:  dbensing@aclu-de.org

Dated:  February 19, 2026