

600 North King Street, Suite 300<br>
Wilmington, DE 19801-3776<br>
302.353.4144

**Susan L. Burke**
Senior Counsel
302.353.4146
SBurke@whitefordlaw.com

July 6, 2026

<u>**VIA ECF AND HAND-DELIVERY**</u>
Honorable Sherry R. Fallon
District Court, District of Delaware
844 N. King Street
Wilmington DE 19801

Re:    **Discovery Disputes in C.A. No. 1:23-cv-01134**

Dear Judge Fallon,

Four months remain until the November 13, 2026 close of fact discovery. *See* D.I. 225 and 271. To ensure that the litigation remains on the current schedule, Plaintiffs respectfully seek the Court's immediate intervention. Specifically, Plaintiffs ask that the Court order VitalCore to: (1) produce certain documents that VitalCore refuses to produce based on privilege, relevance, and duplication of DDOC's production;[1] (2) produce ESI after using the agreed-upon search terms for Hudson, Jamison, Singareddy and Tomarchio; (3) answer Interrogatories Nos. 1, 2, 3 and 5; and (4) provide dates for depositions of John Barnas, Jessica Martin, Shyam Singareddy, and John Tomachio. *See* D.I. 288 and 297.

## I.    PLAINTIFFS' CLASS CERTIFICATION DISCOVERY PROPERLY FOCUSES ON CLASS-WIDE EVIDENCE.

Plaintiffs seek discovery from VitalCore proportional to the class certification phase of the litigation. During that stage, discovery focuses on compiling the evidentiary record about systemwide problems. That is, "[w]hen determining whether to certify a [prison healthcare] class, the court will need to decide whether there is evidence that the problems the named plaintiffs allege to have occurred have common causes and common solutions – *i.e.*, whether the causes of those problems could feasibly be remedied en masse." *Dunn v. Dunn*, 163 F. Supp. 1196, 1206 (M.D. Ala. 2016). As the Third Court explained in *Harnish v. Widener University School of Law*, 833 F.3d 298, 305 (3d Cir. 2016), "the court's Rule 23(b)(3) finding necessarily entail some analysis of whether the proposed class-wide evidence will actually be sufficient for the class to prevail on the predominant issues in the case. If class-wide evidence is lacking, the court cannot be adequately assured that individualized evidence will not later overwhelm the case and rending it unsuitable for class-wide adjudication. This analysis will often resemble a

---

[1] The nine categories of documents at issue are monthly status reports, healthcare advisory committee meeting minutes, medical staff meeting minutes, health services reports, CQI reports and minutes, M&M reports/adverse incident reports, joint provider meeting minutes, special needs multidisciplinary team meeting minutes, and subcontracts.

*\*\*Whiteford, Taylor & Preston LLC is a limited liability company. Our offices outside of Delaware operate under a separate Maryland limited liability partnership, Whiteford, Taylor & Preston L.L.P.*

July 6, 2026
Page 2

merits determination, in that it relates to plaintiffs' ability to provide the elements of their claims." *Id.  See also In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 311-12 (3d Cir. 2008) (task for plaintiff at class certification is to establish that the element . . .  is capable of proof at trial through evidence that is common to the class rather than individual to its members.").

In accord with Third Circuit jurisprudence, the Magistrate Court recommended that "Plaintiffs should be permitted to take discovery to determine the extent to which the putative class members' medical care was delayed or denied pursuant to an unlawful policy, custom or practice." D.I. 78 at 30.  The District Court adopted the recommendations in full.  D. I. 89.  Each of the categories of documents being withheld by VitalCore are precisely this type of class-wide discovery needed to establish for the Court that the evidence that will be shown to the jury is class-wide evidence, not evidence specific to the Class Representatives.

## II.    VITALCORE IS WITHHOLDING EVIDENCE BASED ON A PRIVILGE THAT HAS NOT BEEN RECOGNIZED IN EIGHTH AMENDMENT CASES.

Critical evidence is being withheld by VitalCore based on a meritless claim of a medical some sort of peer review privilege.[1]  But such a privilege has not been recognized as part of federal common law.  Generally speaking, the Supreme Court and the Third Circuit have declined to recognize a privilege protecting litigants who engaged in some form of self-critical analyses.  *Univ. of Pa. v. EEOC*, 493 U.S. 182, 189 (1990); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 351 n. 12 (3d Cir. 2009)(criticizing district court for sealing record based on self-critical analysis privilege). *See also In re Grand Jury*, 103 F.3d 1140, 1150 (3d 1997) (creating privileges disfavored).

That lack of federal common law has not prevented VitalCore and other private healthcare correctional companies across the nation from asking for the recognition of the privilege to allow them to escape production of internal reviews that document system-wide problems, such as CQI and morbidity and mortality reviews.  But the majority (if not all) of the federal courts who have been asked to shield internal reviews conducted by defendants have refused to do so.  *See Agaster v. Maricopa County,* 422 F.3d 836, 839 (9th Cir. 2005) (in prison litigation, no privilege protects morbidity and mortality reviews from production); *Tanner v. McMurray*, 405 F.Supp. 3d (D.N.M. 2019)(prison healthcare company cannot withhold CQI documents from discovery in civil rights case); *Williams v. City of Philadelphia*, 2014 WL 5697204 * 4 (E.D. Pa. Nov. 4, 2014) (public interest weighs against allowing Corizon, a prison healthcare company, to withhold mortality and sentinel event reviews in a challenge brought by inmates for Constitutional violations); *McClendon v. City of Albuquerque*, 2015 WL 13667177 **5-7 (D.N.M. Oct. 13, 2015) (quality assurance and mortality reviews had to be produced); *Johnson v. Cook County*, 2015 WL 5144365, *3-8 (N.D. Ill. Aug. 31, 2015)(no privileges protect morbidity and mortality reviews or CQI materials in prison litigation alleging systemic Constitutional violations); *Dunn v. Dunn*, 163 F. Supp. 1196, 1206 (M.D. Ala. 2016)(finding a

---

[1]  VitalCore uses various names for this privilege: "privileged and confidential peer-review, qualifity-assurance,  morbidity-and-mortality"  "health   protected   information"  "patient-identifying, security-sensitive." *See* Exhibit B.

July 6, 2026
Page 3

consensus that no federal privilege protects medical peer review materials in civil rights actions); *Laaman v. Powell*, 1995 WL 54417 *2 (D.N.H. Feb. 9, 1995)(self-critical analysis privilege cannot be applied to protect quality assurance documents in prison litigation); *Tortorici v. Goord*, 216 F.R.D. 256 * 258 (S.D.N.Y. 2003) (quality assurance documents must be produced in case involving inmate suicide).[1]

All of the documents being withheld by VitalCore pursuant to this privilege are highly probative and relevant to the class certification analysis.  All contain system-wide information.  To the extent they reveal patient-specific information, the Court has already put in place the framework that protects such information from public disclosure.  *See* D.I. Nos. 112, 159, 180, and 284.

Specifically, CQI or continuous quality improvement is the process by which VitalCore identifies systems and processes that are not working, develops and implements correction action plans to try to fix the problems, and then measures whether the corrective plans worked or not.[2]  VitalCore promised in it contract that it would "implement a continuous quality improvement (CQI) program" pursuant to DDOC's policies.  *See* Exhibit A (contract excerpt - VitalCore_00034917).   As the *Dunn* court observed when confronting an identical discovery dispute, "MHM's quality-assurance records may be valuable evidence on this [class certification] question, because their very purpose is to identify, from the view of providers, any systemic problems and solutions."  *Dunn v. Dunn*, 163 F. Supp. 1196, 1206 (M.D. Ala. 2016).

M&M reports/adverse incident reports and the meetings of the joint provider meeting minutes are after-the-fact reviews of serious failures of VitalCore's delivery of healthcare.  VitalCore has produced one set those documents with respect to Harry Samuel but has failed to produce the remainder of the documents that are needed to establish that the egregious failures that led to Samuel's death are replicated time and time again.

Given that class certification requires looking beyond the representative Plaintiffs to see if others suffered from the failures they endured, CQI and M&M reports/adverse incident reports are relevant and include highly probative system-wide data.   Plaintiffs bear a heavy burden on class certification and need access to the full set of system-wide reports that will establish that the malfeasance they endured was not unique but was also endured by incarcerated persons in all facilities from the start of VitalCore's contact on May 1, 2023 to the present day.  *Reyes v. NetDeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015) (class certifications findings by district court must rest on the preponderance of the evidence).  Any burden on VitalCore is modest and

---

[1] VitalCore's reliance on *KD v. United States*, 715 F. Supp. 2d 587, 596-603 (D. Del. 2010) is misplaced because that case created a qualified and narrow privilege and expressly noted it was unique to the facts of the case, which involved monitoring an NIH protocol for a clinical trial.  The court held that it had to ensure that no other federal policy was offended if it protected NIH review materials from disclose.  It noted, "[u]nlike claims alleging violation of federal civil rights . . . no such federal policy is at stake in a medical malpractice case."  *Id*. at 597.

[2] VitalCore appears at times to use the terminology "Quality Assurance and Performance Improvement (QAPI)" for its CQI programs.

July 6, 2026
Page 4

proportional to the litigation because VitalCore necessarily maintains and produces these documents on a regular basis to DDOC.

### III.    PLAINTIFFS ARE NOT ASKING VITALCORE TO DUPLICATE ANY OF DDOC'S PRODUCTION.

VitalCore asserts that it should not be required to produce monthly status reports, healthcare advisory committee meeting minutes, medical staff meeting minutes or health service reports because DDOC has already produced examples of those documents.  *See* Exhibit B (VitalCore's June 10, 2026 letter).  But the DDOC's limited productions – which are mainly related to Centurion's efforts -- do not suffice to provide Plaintiffs the necessary window into the operation of the healthcare system by VitalCore.

Monthly Status Reports:  VitalCore, not DDOC, is the party responsible for drafting and providing "Monthly Status Reports" that are required to set forth, among other things, the status of any corrective actions, any delays, information on staffing, and any reports made to the professional regulation or law enforcement.  *See* Exhibit C (contract excerpt, Vitalcore_00034918). In its letter seeking to evade its obligation to produce these documents, VitalCore has identified a single document produced by DDOC, DOC_0139494.  But that was a document created by Centurion, and reveals nothing about VitalCore.  VitalCore has held the contract for 38 months and needs to produce the 38 monthly status reports that are required by its contract if they exist.

Healthcare Advisory Committee Meeting Minutes:  DDOC has produced a few of VitalCore's meeting minutes.  (The majority of the citations by VitalCore refer to Centurion documents, which have no bearing on an assessment of VitalCore's performance.) But Plaintiffs are not asking VitalCore to produce the same minutes, only those that have not been produced by DDOC.  These documents contain precisely the type of system-wide data that supports class certification, such as data on the lack of staffing, unfilled vacancies, backlogs on mental health evaluations, delays on sending out incarcerated persons for medically-required consultations, and rate of medication errors.

Medical Staff Meeting Minutes:  VitalCore asserts DOC produced one email with the hearing "full bureau staff meeting" and therefore it should be excused from producing any minutes.  But that email is not a set of meeting minutes but only an invite to a meeting.  It also predates VitalCore's tenure.  The problems discussed by VitalCore medical staff at the regularly-occurring meetings and memorialized in the meeting minutes are the type of system-wide issues that are relevant to the Court's fact-finding on class certification.

Health Services Reports:  VitalCore similarly is trying to evade its responsibilities to produce Health Services Reports, another contractually required document generated by VitalCore.  VitalCore argues that DDOC produced three reports and that should suffice.  But those three reports were created by Centurion, and reveal nothing about VitalCore's failures.

Pharmacy & Therapeutics Committee Meeting Minutes:  Here again, DDOC only produced 3 sets, although at least all three meetings occurred during VitalCore's tenure.  These

July 6, 2026
Page 5

documents reveal important system-wide facts about how many incarcerated persons are receiving their medications, how many are not able to access prescribed medications, and how VitalCore is trying to drive down its medication costs.  This evidence will be used to show how the fixed-fee payment structure creates incentives for VitalCore to drive down costs of medications by risking the health of the incarcerated persons.

Multidisciplinary Team Meeting Minutes:  VitalCore claims that DDOC's production of invites to these meetings should negate VitalCore's obligation to produce the actual minutes from the meetings.  But invites alone are not probative of anything other than the fact that these meetings occurred.  The minutes discuss what happened.  According to VitalCore's own policy document, these team meetings were part of the CQI (which VitalCore termed Quality Assurance and Performance Improvement) process and were intended to "assure all incarcerated individuals with special needs receive appropriate care."  *See* Exhibit D (DOC_0173480) (filed under seal).

Subcontracts:  Plaintiffs are not seeking all subcontracts entered into by VitalCore.  Rather, they asked for a small selection, including the contracts with the large health systems BayHealth, Christiana and Beebe, and then a sampling of contracts with outside providers of durable medical equipment providers, specialty physicians practices and imaging practices.  This is a modest burden.  As with the P&T minutes, these documents will show how VitalCore could have delivered adequate healthcare but doing so would cut into its financial incentives.  This financial dynamic is exactly the type of system-wide evidence suitable to support Plaintiffs' motion for class certification.

In sum, VitalCore cannot hide behind DDOC's production to evade its discovery obligations.  Plaintiffs are seeking only documents that speak to system-wide deficiencies in VitalCore's delivery of healthcare.  Such requests are proportional to the importance of this case, a class action alleging that VitalCore acted with deliberate indifference and failed to provide adequate healthcare to those incarcerated in Delaware.  A sentence of life imprisonment should not be the equivalent to a death sentence, yet it has been for many due to the lack of healthcare.  Plaintiffs are entitled to build a robust evidentiary record for this Court to consider in deciding class certification.

## IV.    VITALCORE SEARCHED FOR ESI USING THE WRONG SEARCH TERMS.

On May 13, 2026, Plaintiffs learned that VitalCore's former counsel searched the ESI for Tereasa Jamison, Shyam Singareddy and John Tomarchio but used search terms that Plaintiffs had not reviewed or agreed to, and that are not designed to elicit information about the putative class members, but rather are targeted at the class representatives.[1]  VitalCore did not search for ESI beyond October 11, 2023, the date Plaintiffs filed suit. VitalCore did not search *any* ESI for Hudson, the Chief Operating Officer who will be deposed on July XX.  Plaintiffs cannot fathom

---

[1] Former VitalCore counsel searched multiple custodians using the following search terms rather than the agreed-upon terms: Harry Samuel, Henry Samuel, Christopher Desmond, Arthur Govan, 001603880, 00229027, 00210360, Medical, Treatment, Prescription, Therapy, X-ray, Transportation, Medication, Doctor, Reports, Psychological, Psychiatric, Recommendation, Surgery.

July 6, 2026
Page 6

why former VitalCore counsel used the wrong terms given that he agreed in writing to the terms set forth above.  See Exhibit XX.  During subsequent meet-and-confers, Plaintiffs asked current counsel to correct this problem and run the ESI searches for the four executives with the correct terms.[1]  VitalCore's new counsel has refused to do so, taking the position that Plaintiffs already have access to a significant number of emails from these custodians through the DDOC production.  That is accurate, but even with the DDOC productions, Plaintiffs are missing a critical piece of the evidentiary puzzle:  *internal VitalCore communications* among executives discussing the system-wide failures that were not sent to DDOC, the customer.  These are the type of internal confidential and candid email discussions that are likely to shed the most light on the systemic and company-wide nature of the policies, practices and customs that are preventing access to healthcare.

### V.    VITALCORE IMPROPERLY REFUSES TO RESPOND TO INTERROGATORIES.

Plaintiffs served their First Set of Interrogatories on April 21, 2026.  Exhibit E.  VitalCore failed to object within the thirty days required by F.R.C.P. 33(b)(2) and instead inexcusably delayed responding until June 12, 2026.  Exhibit F.  For that reason alone, the Court should order VitalCore to respond fully.  Even assuming *arguendo* the Court excuses the missed deadline, the Court should order responses because the interrogatories are narrowly tailored to seek relevant information.

*Interrogatory No. 1* requires VitalCore to "[p]rovide the number of "consults pending for UM approval" for each month in the VitalCore Time Period, including but not limited to the present month, April 2026."  This evidence will prove that VitalCore adopted a company-wide policy, custom and practice of sending all health care providers' referrals to outside specialists to the "utilization management" department, which focused on the cost that VitalCore would incur if it provided the medically-required healthcare outside the prisons. This UM-approval process delayed and denied needed surgeries, diagnostic procedures, and specialist consultations as a way to reduce VitalCore's costs.

*Interrogatory No. 2* requires VitalCore to "[p]rovide the number of "consults for offsite" for each month in the VitalCore Time Period, including but not limited to the present month, April 2026."  *Interrogatory No. 3* requires VitalCore to "[p]rovide the number of "Pending Scheduling" visits for each month in the VitalCore Time Period, including but not limited to the

---

[1] The following are the correct search terms for the class certification phase of the case:
complain*
"sick call"
specialist*
standard* w/5 care
supervis* w/10 (medic* OR health* OR sick*)
subcontract*
turnover

July 6, 2026
Page 7

present month, April 2026." These two interrogatories (using VitalCore's own terminology) seek the data that will establish VitalCore utterly failed to keep up with the demand for outside services and consistently allowed a backlog to accumulate. These delays had realtime and at times deadly consequences for the putative class members as surgeries were not provided, cancers continued to spread unchecked, and serious heart disease went unmonitored by cardiologists.

*Interrogatory No. 4* asks "What steps, if any, did VitalCore take to correct the staffing shortages displayed by the DE Staffing Rosters. Provide the nature and date of the steps taken, identify the persons implementing those steps and set forth the expenditures associated with those steps." VitalCore answered this Interrogatory touting its efforts to increase staffing, but it failed to provide the critical details needed to investigate these alleged efforts – namely, it failed to provide the dates of the steps taken, failed to identify the persons involved, and failed to provide how much it spent on those efforts. VitalCore is thus preventing Plaintiffs from being able to challenge VitalCore's anticipated defense that it fixed the understaffing that caused the delays and denials of necessary healthcare.

*Interrogatory No. 5* requires VitalCore to "[i]dentify each event when VitalCore authorized a deviation from the requirements enshrined in the DOC polices and the DOC contract governing VitalCore. Include the date, person providing the authorization and describe the nature of the deviation."

This interrogatory seeks to elicit the details about VitalCore's repeated violations of DDOC policies and the contract. DDOC kept requiring VitalCore to adopt Corrective Action Plans and fix these violations. Plaintiffs served the interrogatory to establish that the dates and nature of these violations, and identify which of VitalCore's executives are most knowledgeable about the violations and any efforts to fix them.

## VI.    VITALCORE IMPROPERLY REFUSES TO COOPERATE WITH SCHEDULING DEPOSITIONS.

On April 20, 2026, Plaintiffs asked VitalCore to provide deposition dates for 10 people, including, among others, Shyam Singareddy, John Tomachio, John Barnas and Jessica Martin. Subsequently, during meet-and-confers, VitalCore agreed to provide deposition dates for Stewart and Hernandez prior to the then-deadline for expert reports, June 19.[1] Although Plaintiffs' counsel initially agreed to wait on the other depositions until after Stewart and Hernandez were deposed to obtain the dates for the other witnesses, that proved unworkable in light of VitalCore's delays in providing dates. The parties conferred again on June 10, 2026 (with still no dates yet provided for Stewart and Hudson), and Plaintiffs requested dates for Singareddy, Tomachio, Barnas and Martin. Counsel explained that the passage of time without dates for Hudson and Stewart made it impossible to continue to postpone additional scheduling. VitalCore counsel took the position that Plaintiffs were not entitled to any more depositions

---

[1] VitalCore also advised Clark, Davis, Raab and Gregg were no longer employees and VitalCore counsel had not communicated with them.

July 6, 2026
Page 8

beyond Stewart and Hernandez, and its follow up letter did not commit to obtaining dates for any witnesses other than those two.

There is no reasoned basis to refuse to make employees available for depositions. The April 17, 2026, Scheduling Order – which adopted the parties' stipulation -- permits each side to conduct up to 350 hours of deposition. To date, Plaintiffs have only taken 3 depositions of VitalCore employees, and have done so efficiently, consuming only 10 hours in total. Each of the persons identified by Plaintiffs have relevant and important knowledge.

John Barnas is the CQI nurse at JTVCC. He took the lead on investigating the many sick calls delays, He is well-positioned to testify on the extent of the delays, the causes of the delays, and efforts, if any, by VitalCore to fix the broken sick call system. He also tackled other compliance failures, such as understaffing the counting of sharps. He played a lead role in procuring durable medical equipment and will be able to testify about VitalCore's failures to provide prescribed medical equipment in a timely fashion.

Dr. Shyam Singareddy is the leader of the team investigating VitalCore's ongoing failures to provide the medically-required outside consultations, procedures, surgeries and diagnostic tests. Plaintiffs are entitled to explore his knowledge and obtain admissions from him about the magnitude of the problems. For example, Dr. Singareddy is well-positioned to testify that the delays and denials of specialty care and procedures existed at *every* prison in Delaware, not merely JTVCC or SCI.

Dr. John Tomarchio served as a leader of VitalCore's Medication-Assisted Treatment ("MAT") program and was tasked with trying to correct the ongoing denials of care. As the State of Delaware has admitted on the record, Centene systemically and routinely denied incarcerated persons in the program their prescribed treatment and counseling, and then falsified the medical records to hide the denial of care from DDOC. Exhibit G (lawsuit brought by Delaware against Centene). When DDOC brought in VitalCore, the company tasked Dr. Tomarchio with overseeing the MAT care. Plaintiffs are entitled to explore if Centene's policies of understaffing and record falsification continued under VitalCore, as is suggested by emails produced to date. These are precisely the type of system-wide denials of care that are probative for class certification.

Jessica Martin is a registered nurse and the Health Services Administrator at JTVCC. She attended the site visit. In her job, she oversees all of VitalCore's contractual compliance at JTVCC, the largest prison in the State. Among other topics, she has been involved in addressing the failures and delays in sending incarcerated persons to outside specialists for consultations, delays in intake evaluations, medications problems, and failures to properly chart medical care. She also is involved in managing the M&M reports and addressing grievances filed by incarcerated persons. In short, she is well-positioned to speak in detail about multiple system-wide problems.

VitalCore counsel has offered no reasoned basis to refuse to cooperate with scheduling depositions. Instead, during the meet-and-confers, VitalCore simply claimed Plaintiffs were on a "fishing expedition" and should be satisfied with the discovery already in hand. Plaintiffs raised

July 6, 2026
Page 9

the topic again on the last meet-and-confer, which was held at noon on July 6, 2026 and attended by undersigned counsel. VitalCore counsel advised their client agreed to produce some of the categories of documents previously disputed and would provide more specificity on July 7, 2026, but would not amend their position with respect to the cessation of depositions. In sum, the parties are not able to resolve the dispute without court intervention.

Plaintiffs respectfully request that the Court intervene in the aforementioned disputes. A proposed Order setting forth in detail the relief requested is included with this letter.

Sincerely,

*/s/Susan L. Burke*

Susan L. Burke

cc: Counsel of Record via ECF
SLB:bs